Filed 4/3/25  P. v. Ruiz CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B328286 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA190220) |
| v. | |
| RICARDO RUIZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.

Many years after his conviction, defendant and appellant Ricardo Ruiz (defendant) filed a petition for resentencing under Penal Code section 1172.6 (former section 1170.95).[1]  The trial court denied the petition because it found defendant could still be convicted of murder under current law as a direct aider and abettor, i.e., as an accomplice who, with either express or implied malice, participated in a fatal group assault on one of his jailhouse cellmates.  We chiefly consider whether the trial court applied the correct legal standard and whether substantial evidence supports the court's finding that defendant aided and abetted an implied malice murder.  (We need not decide whether the evidence supports the court's alternative finding that defendant acted with express malice, i.e., an intent to kill.)

I.  BACKGROUND

A.    *The Offense Conduct*

In July 1999, defendant was housed in the Los Angeles County Men's Central Jail in a cell with Ronnie Pintor (Pintor), Josue Felix (Felix), Sergio Cortez (Cortez), Ramon Sandoval (Sandoval), and victim Mauricio Avalos (Avalos).  Late that night, two Los Angeles County Sheriff's Department deputies went to the their cell to check on Avalos's welfare.

When the two deputies arrived at the cell, defendant was standing at the front of the cell, with Pintor just behind him.  Avalos was in the back of the cell, and Felix, Cortez, and Sandoval were behind defendant and Pintor.  One of the deputies, Deputy Alvarado, told the men that Avalos had a pass

---

[1]     Undesignated statutory references that follow are to the Penal Code.

2

to leave the cell.  Defendant replied that Avalos was "not going anywhere."  Deputy Alvarado asked again for Avalos to come out, but that second request also went unheeded.

Deputy Alvarado then left to get a sergeant.  Before that happened, two other deputies, Garcia and Rudd, reported to the same cell.  By the time they arrived, Avalos was on the top bunk on the far right of the cell.  Defendant and Pintor were still standing facing the cell door, and Cortez, Felix, and Sandoval were standing in the back.

Deputy Rudd told Avalos to get off the bunk and get handcuffed.  Defendant told the deputy that Avalos was not going to "hook up" (meaning get handcuffed).  At the same time, Avalos remained sitting on the bunk, appeared nervous, and was shaking his head up and down.

Defendant stuck his hand out of his cell, toward a nearby cell, and said "Casper, mandalo," which translated into English as, "Casper, send it."  Deputies Alvarez and Rudd told defendant to put his hand back in the cell.  Defendant complied, but then he stuck his hand out again, saying the same thing.

After that, a sergeant, Hendrix, arrived and told the inmates that Avalos needed to come out for a pass.  Defendant again said, "He's not coming out."  Sergeant Hendrix told the men to get up and get handcuffed.  Defendant responded they were not going to hook up.  According to one of the deputies, defendant yelled "Casper, they are ordering us to hook up.  They are going to spray us.  Send us the word."

A short time after that, defendant and Pintor tied torn up shirts or towels around their faces.[2] Defendant then climbed onto the bunk next to Avalos and hit Avalos in the face or upper body. Avalos fell over on the bunk after defendant hit him. Pintor then picked Avalos up by the shirt and the groin area and slammed him head first into the floor.[3] At that point, defendant jumped off the bunk.

All five inmates then swarmed Avalos and started kicking and punching him while he was curled up in a ball on the floor. One of the deputies specifically saw defendant kicking and punching Avalos. Sergeant Hendrix ordered the inmates to stop the assault, but they did not.

Inmates in other cells in the row began throwing items at the deputies and yelling and screaming at them. Sergeant Hendrix ordered the deputies to spray a substance akin to pepper spray into the cell, which they did. That, too, did not stop the assault on Avalos. Sergeant Hendrix then ordered the deputies to leave the area outside the cell. As the deputies left, they could still see defendant and the others continuing to attack Avalos.

Roughly 8 to 10 minutes later, a large contingent of deputies arrived to restore order. Defendant, Pintor, and the other inmates that had been beating Avalos were handcuffed and Avalos was found under one of the bunks; his head was visibly

---

[2] Deputy Garcia did not recall seeing defendant or Pintor putting anything around their heads.

[3] Deputy Garcia testified that Pintor pulled Avalos off the bunk, but he stated Pintor might have lifted Avalos a few inches. He could not see which part of Avalos's body hit the floor first.

swollen and "oblong."  He later died from multiple blunt force injuries to his head.

### B. Subsequent Investigation of the Fatal Beating

A medical examiner opined that being thrown down onto the ground could have been the cause of significant injury to Avalos's brain.  A medical examiner also believed kicks to Avalos's head could have contributed to his subdural hematoma (bleeding in the brain)—even kicks by someone wearing soft shoes (like defendant was wearing) if the kick caused Avalos's head to hit another hard object.

None of Avalos's cellmates had any injuries to their hands the day after the beating.  Pintor's and Felix's feet and ankles were bruised, but none of the others' feet were injured.  The clothing and shoes defendant and the other men were wearing the day of the attack had Avalos's blood on them.  None of the clothing appeared to have excessively more blood than the others, and the blood was more concentrated on the front of the assaulting inmates' clothes.  Avalos's blood was found in various parts of the cell, including on the iron gate of the cell door, the wall near the toilet bowl, and different portions of the floor.

### C. Trial, Conviction, and Sentencing

In June 2000, defendant, Pintor, and the others were each charged with murdering Avalos.  Pintor was tried first, and separately from the others, and a jury convicted him of first degree murder (requiring a life without possibility of parole sentence).  At defendant's subsequent murder trial, Pintor (who was in jail after just having been convicted of murder in another

5

case) testified in defendant's defense and claimed he (Pintor) was solely responsible for Avalos's death.

Pintor testified he met Avalos when Avalos arrived at the jail, about three or four weeks before his murder. About two weeks before the murder, there was an incident in which someone told Pintor that Avalos possessed a blade. Pintor confronted Avalos, who said he had overheard talk suggesting Pintor was out to get him. Pintor took Avalos's blade and flushed it down the toilet. Pintor also wanted to hurt Avalos because he felt disrespected.

On the night of Avalos's murder, Pintor assumed the deputies were trying to take Avalos out on an "Operation Safety Jail" pass, which meant he would be interviewed by deputies and raised concerns he would inform on them or other inmates. Pintor did not want Avalos to leave because it was obvious to him Avalos did not want to be there, and he believed that once Avalos left he would not be coming back. Pintor also claimed he, not defendant, was the one who told deputies that Avalos would not be leaving the cell.

According to Pintor, the fight with Avalos started while both of them were standing and Avalos hit him in the face before getting onto the bunk. Pintor admitted he then threw Avalos from the bunk and he said Avalos hit the floor head first, at which point Pintor started kicking and beating him. Pintor then dragged Avalos toward the front of the cell and leaned him against the gate to kick him in the head. Pintor claimed no one else in the cell hit Avalos; they were just standing around like everything was normal.

After the presentation of evidence and argument at trial, the jury found defendant not guilty of first degree murder but

guilty of second degree murder.  The trial court sentenced defendant to 15 years to life in prison.  Defendant appealed, and a prior panel of this court affirmed the conviction.  (*People v. Sandoval et al.* (September 19, 2005, B176199) [nonpub. opn.].)

### D. Defendant's Section 1172.6 Resentencing Petition

Defendant filed a section 1172.6 petition in November 2019.  He asserted he was not the actual killer and had been convicted of murder based solely on a natural and probable consequences theory of liability.

The trial court initially denied defendant's petition without appointing counsel and relying on the statement of facts in this court's prior appellate opinion.  Defendant appealed this denial, and a prior panel of this court reversed and remanded with directions to appoint counsel for defendant and thereafter proceed as required by section 1172.6.  (*People v. Ruiz* (June 22, 2021, B305229) [nonpub. opn.].)

The trial court did so on remand.  After receiving briefs from the parties, the court held an evidentiary hearing and stated at the outset that it was "familiar with the record of conviction, which includes the transcripts at issue."  The People argued the evidence at trial proved beyond a reasonable doubt that defendant was a direct aider and abettor who acted with either express or implied malice aforethought.

The trial court found defendant took part in the jailhouse beating that resulted in Avalos's death.  In the court's view, defendant and the other inmates thought Avalos was a snitch, defendant struck the first blow to Avalos's face (which caused him to fall over on his bunk), and Pintor was thereafter the more aggressive attacker—including by throwing Avalos headfirst to

the concrete floor. The court found that after that, the others, including defendant, continued to kick and hit Avalos.

The court, in its oral on-the-record ruling, accordingly "agree[d] that it can be concluded that the petitioner either acted with express or implied malice aforethought as reflected by his conduct when he initiated the assault by, one, taking the first blow at the victim, which knocked him over; two, appeared to be leading the assault; and, three, his continued brutal beating of the victim, along with the other inmates, while the victim was lying on the floor after suffering a severe injury to the head." The court believed defendant's participation in the continued "brutal beating by fists and kicks" after Avalos was dropped headfirst onto the ground manifested "an express intent to kill him." The court also reasoned, in the alternative, that "it can . . . be concluded from the record of conviction that [defendant] acted with at least implied malice by engaging in inherently reckless conduct which he should have been aware was dangerous to human life considering the overall circumstances of the assault." In the court's words, defendant "at the very least . . . acted with implied malice, engaging in reckless conduct after the defendant was bleeding profusely after suffering a severe brain injury, in continuing his assault." The trial court therefore denied defendant's petition and concluded that "no matter how the overall evidence in the record of conviction is interpreted, the petitioner could still be convicted of murder beyond a reasonable doubt even with the amendments brought about by Penal Code Section 1172.6."

8

## II. DISCUSSION

The trial court did not err. The record does not establish, as defendant contends, that the court misapplied the legal standard governing section 1172.6 petitions. Although the court couched its remarks in unnecessarily passive terms ("it can be concluded"), the entirety of the court's ruling leaves us convinced the court understood its obligation to make its own determination beyond a reasonable doubt that defendant was guilty of murder even under the law as recently amended to eliminate the natural and probable consequences doctrine. The record does establish, again contrary to defendant's contention, that sufficient evidence supports the court's finding that defendant could still be convicted of murder as a direct aider and abettor to an implied malice murder. Defendant's knowledge that his conduct endangered the life of another and his acts in conscious disregard for life (see, e.g., *People v. Reyes* (2023) 14 Cal.5th 981, 990) are readily seen in the substantial evidence that he struck Avalos first and then continued the attack even after Avalos was slammed into the floor headfirst and defenseless—and despite prison guard orders to stop.

### A.     *The Trial Court Applied the Correct Legal Standard*

At an evidentiary hearing held pursuant to section 1172.6, subdivision (d), "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The trial court acts as the finder of fact when determining whether the prosecution has met its

9

burden beyond a reasonable doubt. (*People v. Clements* (2022) 75 Cal.App.5th 276, 296-297.)

Defendant argues the trial court employed the wrong standard at the evidentiary hearing because it did not make its own beyond a reasonable doubt determination and instead decided only that there was sufficient evidence by which some other factfinder could determine defendant could be convicted of murder under current law.[4] Defendant specifically points to the aforementioned "it can be concluded" passive constructions the trial court used when ruling from the bench.

That is not our view of the record. We start from the premise that "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) In fact, there is no question in this case that the trial court was aware of the correct legal standard because the evidentiary hearing took place a year after the Legislature amended section 1172.6 to specify the applicable beyond a reasonable doubt standard and both the People and defendant cited this standard to the court in arguing the matter. There is no reason to believe the trial court did not follow the standard on which the parties agreed. Although the trial court's passive "it can be concluded" constructions are unnecessarily indeterminate, they are not evidence the court deviated from the correct standard in the full context of the court's ruling. (See, e.g., *People v. Price* (1992) 4 Cal.App.4th 1272, 1276 [use of less

---

[4] Defendant also asserts the trial court misunderstood the elements of aiding and abetting an implied malice murder. We discuss and reject that claim *post* in the context of our discussion of the evidence supporting an aiding and abetting implied murder finding.

10

than artful language "cannot be equated with having applied the wrong standard"].)  The court stated, for instance, it found "the petitioner could still be convicted of murder beyond a reasonable doubt even with the amendments brought about by Penal Code Section 1172.6."[5]  The court also stated it "believe[d] that the facts bear this out, as the court has stated in its ruling, at the very least [defendant] acted with implied malice . . . ."  These are affirmative statements of the court's own conclusion after weighing the evidence.[6]

---

[5]  As used, the "could be convicted" language is not properly read as conditional; it is instead the converse of the language of the statute itself.  (§ 1172.6, subd. (a)(3) [a petitioner may file a petition for resentencing if he or she "could not presently be convicted of murder"].)

[6]  Defendant also suggests the order of argument at the hearing, which seems to have been somewhat less structured and traditional than the norm, reveals the court put the burden of proof on the defense.  That in our view is a non sequitur and it is in any event unsupported by the trial court's evaluation of the evidence.  *People v. Esparza* (2015) 242 Cal.App.4th 726 is not to the contrary.  The problem that led to reversal in that case was twofold.  There was a dearth of authority on which party bore the burden of proof and, at the contested hearing, the trial court asked the defense to present evidence first and only asked the prosecutor if she wished to present witnesses after the defense rested.  (*Id.* at 742-43.)  Neither problem is present in this case.

11

B.    *Substantial Evidence Supports the Trial Court's Finding that Defendant Is a Direct Aider and Abettor of an Implied Malice Murder*

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188, subd. (a).)  Express malice is the intent to kill; implied malice exists "where the defendant . . . acted with conscious disregard that the . . . consequences of [his or her] act or actions were dangerous to human life." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.)  At the time of defendant's conviction at trial, the law allowed defendants who did not act with malice to be found liable for murder under certain circumstances, including under the natural and probable consequences doctrine.

Under current law, however, the possibility of murder liability pursuant to the natural and probable consequences doctrine has been eliminated.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847.)  That means, as relevant for our purposes, that defendant could still be convicted of murder under current law—the condition that forecloses section 1172.6 relief—only if there is sufficient evidence he directly aided and abetted an express or implied malice murder.  We proceed to discuss the latter alternative.[7]

"Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation required for first degree murder." (*In re Ferrell* (2023) 14 Cal.5th 593, 600.)  "Implied malice requires proof of both a physical act

---

[7]    Because Pintor was tried separately, there is no inconsistency or tension between the focus of our discussion here and the verdict the jury reached in Pintor's case.

and a mental state. Physically, a defendant must perform an act whose natural consequences are dangerous to life, or put another way, defendant must perform 'an act that involves a high degree of probability' of death. [Citations.] To establish the mental state required for implied malice, the defendant must deliberately perform the act with a conscious disregard for life, knowing the act endangers another's life." (*Ibid.*) Restated in the context of aiding and abetting another perpetrator, the elements of implied malice murder require act(s) by the perpetrator endangering the victim's life; words or conduct by the aider and abettor that aid in the commission of the perpetrator's life-endangering act(s); and knowledge by the aider and abettor that the perpetrator intended to commit the life-endangering act, an intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and action in conscious disregard for human life. (*Reyes*, *supra*, 14 Cal.5th at 991 [quoting with approval *People v. Powell* (2021) 63 Cal.App.5th 689].)

Substantial evidence supports the trial court's determination that all of these elements are satisfied here.[8] (See

---

[8]    Focusing on the trial court's reference to "inherently reckless conduct" when discussing its implied malice finding, defendant contends reversal is required because the trial court misunderstood the meaning of implied malice. Even assuming the argument is properly before us because the trial court's reasons for its ruling (not just the ruling itself) are reviewable, and even assuming the absence of an objection to the trial court's articulation of its ruling does not forfeit the issue, defendant's contention still fails. The trial court's "reckless" references do admit of imprecision (§ 188; *People v. Bland* (2002) 28 Cal.4th 313, 327 [conscious disregard for life]; but see *People v. Doyell*

13

generally *Reyes*, *supra*, 14 Cal.5th at 988 [under the substantial evidence standard, courts review the record in the light most favorable to the trial court's order].)  Defendant refused the deputies' requests to have Avalos exit the cell, struck the initial blow on Avalos that knocked him over and facilitated Pintor's body slam of Avalos headfirst on the concrete, and continued to participate in the group beating of Avalos even after his head had been slammed on the ground and he was defenseless.[9]  Put differently, there are life-endangering acts by the perpetrator and knowledge by defendant that Pintor and the others intended to commit those acts (the refusal of the deputies' requests, the

---

(1874) 48 Cal. 85, 96; *People v. Curry* (1961) 192 Cal.App.2d 664, 675 ["the malice aforethought is implied from the wanton recklessness"]), but in the context of a ruling in which the court found defendant had the intent to kill and relied factually on defendant continuing to assault Avalos after he had been slammed on his head, we believe the court's articulation is not so deficient that it reveals a misunderstanding warranting reversal.

[9]     Defendant contends there was no evidence he participated in a continued or sustained beating of Avalos because the deputies for a time left the area outside the cell and did not witness events that occurred after they departed.  While it is true there is no direct evidence of defendant's role during that time, the deputies remained outside the cell for approximately two minutes after the first punch was thrown.  During that time, defendant and the others continued beating and kicking Avalos, and they were still actively doing so when the deputies left the area.  That evidence of continued beating after Avalos had been slammed on his head, plus the blood found on defendant's (and the other accomplices') clothes and shoes, is amply sufficient to support the trial court's findings even without knowledge of what precisely defendant did after that two-minute period.

14

positioning of the assailants and the tying of face coverings, the headfirst body slam, and the continued beating); aiding of those acts by defendant and the intention to aid them (refusing the deputies' requests, striking the first blow, and striking more blows even after Avalos was down); knowledge that the acts were dangerous to life (defendant could see Avalos gravely injured and lying defenseless); and action in conscious disregard of human life (initiating the assault and continuing to participate in beating the gravely injured and defenseless Avalos).

### C. Consideration of Defendant's Age and Cumulative Error

Defendant argues the trial court should have considered defendant's relative youth at the time of the murder (21 years old) when making its implied malice finding but the court was "unaware that [defendant's] youth was a factor to consider" at the evidentiary hearing. Even assuming youth was a proper factor to consider, and even assuming the court was not aware of defendant's age at the time of the offense (despite the court's representation at the evidentiary hearing that it had considered the transcripts of the trial proceedings and "the overall record of conviction"), defendant never asked the court to consider his youth nor did he object to the lack of such consideration after the court made its finding that he aided and abetted an implied malice murder. The point is accordingly forfeited. (*People v. Nieves* (2021) 11 Cal.5th 404, 446; *People v. Scott* (1994) 9 Cal.4th 331, 351.) Even were we to exercise our discretion to overlook the forfeiture as the court did in *People v. Pittman* (2023) 96 Cal.App.5th 400 at page 416, we see no reasonable probability on

this record that the assumed absence of any consideration of defendant's relative youth was prejudicial.

Defendant also makes a cumulative error argument for reversal. The contention fails because there was no cumulative error.

### DISPOSITION

The trial court's order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:


MOOR, J.


KIM (D.), J.


16